UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CONSUELO RENEE DAVIS,
Next Friend and Guardian of ERYC YOUNG,
a Minor,

                              Plaintiff,

                                                    Civil Action No. 05-CV-72669

        v.                                          Judge Avern Cohn

CITY OF DETROIT and
DARREL FITZGERALD[1],
Jointly and Severally,

                              Defendants.
_____/

**ORDER DENYING IN PART AND GRANTING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I. Introduction**

        This is a civil rights case under 42 U.S.C. §1983, with pendant state law claims.

Defendant Police Officer Darrel Fitzgerald (Fitzgerald) shot plaintiff Eryc Young (Young)

in the leg while pursuing Young after he fled on foot from the scene of a car crash

during a high-speed police chase.  Young's mother filed the instant action under 42

U.S.C. §1983.  Young claims that Fitzgerald (1) unlawfully seized him using deadly and

excessive force, in violation of his 4th, 8th [2], and 14th amendment constitutional rights,

_____

        [1] Young names Dwayne Fitzgerald as the individual defendant.  This appears to
be incorrect, as the defendants have filed their pleadings in the name of Darrel
Fitzgerald.  Plaintiffs should file an amendment correctly stating the name of the
individual defendant.

        [2] Young has not articulated the basis for an 8th amendment violation.  The Court
considers the claim abandoned.

and that (2) the City of Detroit, is liable under its policies and customs, described by Young as a "shoot-to-kill" policy, which resulted in the violation of his constitutional rights. In addition, Young asserts the following state law claims against Fitzgerald and City of Detroit: (3) gross negligence, (4) intentional misconduct [3], (5) assault and battery, and (6) intentional infliction of emotional distress. Young requests damages, costs, and attorney's fees. Defendants have filed a motion for summary judgment. For the reasons that follow, the motion is granted and denied in part.

## II. Background [4]

The shooting in question occurred on July 13, 2003, when Young was 14 years old. It is undisputed that he was unarmed on the night in question. Young says that at approximately 1:00 a.m. he was at a neighborhood gas station buying snacks when he saw his friend, "White Boy", pull up in a car. White Boy asked Young if he wanted to ride with him. Young says that he knew White Boy had been incarcerated for stealing cars in the past, and he asked him who the car belonged to. When White Boy assured him that the car belonged to his aunt, Young got into the car. While they were driving, a police car flickered its lights, signaling for them to pull over. Young says that White

---

[3] Young has not articulated the basis for a misconduct claim. The Court considers the claim abandoned.

[4] The background is gleaned from the parties' pleadings and exhibits. Young's version of the facts is derived from his deposition statement. The parties did not follow the Court's summary judgment motion practice guidelines. Neither party filed a statement of facts not in dispute or a counter-statement of facts. Additionally, the parties failed to file exhibits in a separate appendix from the brief with tabs and an index. Neither party provided the Court with copies of cases supporting their positions, with the relevant portions highlighted. For the Court's motion practice guidelines, see http://www.mied.uscourts.gov/_practices/cohn/motion.htm.

Boy sped away from the police car, and that the police pursued them.  Young says that

he told White Boy to pull over or to let him out of the car, but White Boy refused and told

him that the car was in fact stolen.  A moment later, the car crashed into a chain- link

fence.  Young says he and White Boy exited the car and ran away on foot.  He states

that he ran towards an alley, then jumped a gate, with White Boy right behind him.

White Boy shouted for Young to help him over the gate, and while he was doing so, he

says that he heard three shots fired in rapid succession, and then he fell to the ground,

shot.  Young says that White Boy ran off in the opposite direction.  Young says that he

then saw a police officer running towards him [5], and then a second police officer

approached him and said: "You lucky it wasn't me or I would have killed you." [6]   Young

says he was then handcuffed and placed in the ambulance when it arrived.

Fitzgerald's version of the facts differ in some significant respects. Fitzgerald

says that on the night in question, he and Officer Matthew Lashbrook (Lashbrook)

Fitzgerald were patrolling the area of Van Dyke Street and Saint Paul Street in a

marked patrol police car after they received a run to the area of 1037 Townsend to

investigate a complaint that shots had been fired.  The officers say that while on Angus

Street they saw a car run a stop sign.  The officers turned on their siren to signal the car

to pull over, but it fled away. They pursued the car until it crashed into a fence on Coe

Street.

In contrast to Young's version of the events, Fitzgerald says that there was only

---

[5] It appears that Young believes that it was Fitzgerald who shot him.

[6]  It appears that Young believes that the comment was made by of Officer
Matthew Lashbrook, who was on patrol with Fitzgerald that night.

3

one person in the car, and that he exited the car and began to run through a field.  In his field report, created shortly after the incident, Fitzgerald says he chased the suspect along a street parallel to the field.  He says that at this point he carried his flashlight in his left hand and his shoulder microphone in his right hand, and that he notified dispatch of his location.  Fitzgerald then observed the suspect jump over a fence into an alley. Fitzgerald says that he pointed his flashlight towards the suspect and ordered him to the ground.  He states that it was at this point that he drew his department issued gun, a Clock, with his right hand.  He says that he did not know if the suspect was armed or not.  Fitzgerald says that he identified himself as a police officer and again said "get to the ground".  The suspect did not obey his command, and instead turned and attempted to climb back over the fence.  At this time, Fitzgerald says that he dropped his flashlight and ran up to the suspect and grabbed him by the back of the shirt or the waistband of his pants.  Fitzgerald says that his gun was still in his right hand, but that it was "bladed against [his] body".  He insists that as he pulled the suspect down, the suspect fell onto him and that his gun accidentally discharged one time.  He then put the suspect under arrest and checked to see if he had been shot.  Upon finding blood on the suspect's clothing he called for an ambulance.  The suspect was taken to Detroit Children's Hospital and treated for a gunshot wound to the leg.  At some point, the suspect was identified as Young.

Four days after the shooting, the Detroit Police Department Laboratory performed an analysis of a gun and cartridge case.[7]  The "Laboratory Analysis"/

_____

[7] The Court notes that the serial number of the weapon analyzed in the department report is different than the serial number of the weapon Fitzgerald says that

Forensic Report reflects that the examiner found that a "microscopic comparison of the fired cartridge yielded that it was fired in the above weapon."  Furthermore, some clothing-- presumably the clothing Young was wearing when he was shot-- was also analyzed.  Significantly, the examiner found, "[n]o signs of close range firing."  This report, is the basis of Young's assertion that Fitzgerald did not accidently shoot him while pulling him off the fence. [8]

### III.  Summary Judgment

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact.  Anderson

---

he fired.   In his report, Fitzgerald says that the serial number on the weapon is DPD2178.  However the report says that the serial number on the weapon analyzed is 03178DPD.  The reference section of the report states: "Eryc Young/ Van Dyke and Coe/ (7/13/03 Shooting)."  Neither party explains the discrepancy.

[8]  In addition, Young relies on the deposition of David Balash, a firearms expert, who also concluded that Young was not shot at close range.

v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion.  See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); Anderson, 477 U.S. at 249-50.  Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings.  Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law."  In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52).  The Court "must view the evidence in the light most favorable to the non-moving party."  Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995).  Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact.  See Anderson, 477 U.S. at 255.  Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted.  Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

6

## IV.  Analysis

### A.  Young's Claims against Fitzgerald

#### 1. Use of Excessive Force

Young argues that Fitzgerald's actions constitute the use of excessive force in violation of the Fourth Amendment to the U.S. Constitution.[9]  He brings this claim under 42 U.S.C. §1983[10].  Section 1983 on its own creates no substantive rights; rather, it is a vehicle by which a plaintiff may seek redress for deprivations of rights established in the Constitution or federal law.  Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979).  "To successfully establish a claim under §1983, a claimant must show that he or she was deprived of a right secured by the Constitution and the laws of the United States by one acting under the color of law."  Ahlers v. Schebil, 188 F.3d 365 (6th Cir. 1999) (internal citations omitted).

Fitzgerald argues that Young cannot make out an excessive force claim because the shooting was accidental and therefore he is entitled to qualified good faith immunity

---

[9]  The Fourth Amendment provides, in relevant part that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated..."  U.S. CONST. amend. IV.

[10]Section 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. §1983.

from Young's claims.[11]   Young however, insists that there exists a genuine question of fact as to whether Fitzgerald intended to shoot him.  Young says that Fitzgerald gave contradictory statements about the manner is which the shooting occurred in his police report and deposition statement.  Second, Young argues that Fitzgerald's claim that he shot Young while pulling him off of a fence conflicts with the Police Department's forensic report.

## a.  The Legal Standard for Qualified Immunity

Fitzgerald claims qualified immunity,  i.e., there is no showing that there is a genuine issue of fact over whether or not his conduct was reasonable.  In Saucier v. Katz, 533 U.S. 194, 201-202 (2001), the Supreme Court explained that the determination of whether an officer has qualified immunity should be made prior to an analysis of whether unreasonable force was used in making an arrest.  As to whether an officer should be granted qualified immunity, the threshold question is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id.[12]   The Supreme Court further directed that,

> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.  Id.

The Supreme Court further explained that while excessive force is generally determined

---

[11]  Fitzgerald has not argued whether the shooting would be reasonable if he had fired at Young intentionally.

[12] Citing, Siegert v. Gilley, 500 U.S. 226, 232 (1991).

by evaluating whether a police officer acted as an objectively reasonable officer would, the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  Id.[13]  Moreover, the Supreme Court held that where reasonable officers could differ in their determinations of whether an action is objectively reasonable, the officer should be granted qualified immunity: "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  Id.[14]

### b.  Whether Fitzgerald Should be Granted Qualified Immunity

The Court's first step is to determine whether Young's constitutional rights were violated if we accept his version of the facts.  In order to do so, the Court must "set forth the principles which will become the basis for a holding that a right is clearly established."  Saucier, 533 U.S. at 201.

Generally, whether an officer's use of deadly force is unreasonable is analyzed under an objective standard that considers the severity of the crime at issue and whether the victim was armed or posed a danger to the officer or others.  Brosseau v. Haugen, 543 U.S. 194 (2004).  The central legal question is whether a reasonably well-trained officer in Fitzgerald's position would have known that shooting the victim was unreasonable in the circumstances.  Sova v. City of Mt. Pleasant, 142 F.3d 898, 903

---

[13]  Citing, Wilson v. Layne, 526 U.S. 603, 615 (1999).

[14]  Citing, Malley v. Briggs, 475 U.S. 335, 341 (1986)(qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

(6th Cir. 1998).  As stated above, this is an objective analysis.  Subjective factors such as an officer's state of mind, bad faith or malice may not be considered and are irrelevant to the determination of immunity.  Id.

Although, as reflected in the standard above, the reasonableness test is highly fact specific, the Supreme Court has given clear directions for the use of deadly force in apprehending a fleeing suspect.  In Tennessee v. Garner, 471 U.S. 1, 11-12 (1985), the Supreme Court held that it is unconstitutional to shoot an unarmed fleeing suspect who posed no danger to the officers or the public.  In Garner, the Supreme Court held that a police officer who fatally shot an unarmed fleeing suspect should not be granted immunity.  In Garner, police were called to an unoccupied house by a neighbor who suspected that the house was being burglarized.   A police officer who had arrived at the scene heard a door slam and saw someone run across the backyard.  The suspect stopped at a fence.  The officer pointed his flashlight at the suspect, identified himself, and called out for the suspect to halt.  The suspect did not heed the command, and instead began to climb the fence.  The officer then fatally shot the suspect, despite being "reasonably sure" the suspect was unarmed and noting that the suspect appeared to be 17 or 18 years old and of slight build.  Id. at 1.  In finding that the officer did not have qualified immunity, the Supreme Court held:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable.  It is not better that all felony suspects die than that they escape.  Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.  It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect.  A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.

10

..[however] [w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

Applying this standard, the Court finds that a violation could be made out on a favorable view Young's submissions.  Young says that he was 14 years old, unarmed, and attempting to escape the police by climbing over a fence after fleeing the scene of a car crash pursuant to a high speed chase in a stolen car.  He asserts that Fitzgerald shot him from a distance, presumably to prevent his escape.  Fitzgerald states in his deposition that he did not know whether Young was armed.  These facts bear similarity to the facts in Garner, in which the suspect there was unarmed, fleeing the scene of a felony, and attempting to climb a fence when an officer, who did not believe that he was armed, shot him in order to prevent his escape.  A jury could reasonably believe that Fitzgerald did not believe that Young was armed and shot him in order to prevent his escape.

Fitzgerald analogizes his situation to the factual situation in Brosseau v. Haugen, 543 U.S. 194, 195-196 (2004), in which the Supreme Court held that a police officer should be granted qualified immunity because it was not clear that she had used unreasonable force in apprehending a fleeing suspect.  There the police officer attempted to arrest a suspect on an outstanding warrant.  The suspect fled, jumped into a parked car, and locked the doors.  The police officer broke the driver seat window, attempted to grab the keys, and struck the suspect with her gun in an effort to

11

apprehend him.  The plaintiff however, was able to start the car and as he was attempting to drive off, the police officer shot him. Fitzgerald argues that Young's case is similar to Brosseau because both the suspect there and Young were fleeing from arrest when shot.  However, Fitzgerald fails to account for one crucial factor that the Supreme Court specifically analyzed in reaching its decision.  In Brosseau, the officer explained that she shot the plaintiff because she was "'fearful for the other officers on foot who [she] believed were in the immediate area, [and] for the occupied vehicles in [the plaintiff's] path and for any other citizens who might be in the area.' " Id. at 197. The Supreme Court found that the officer's determination that the plaintiff-- who had begun speeding down the street in a car in order to avoid arrest-- posed a danger to others, was reasonable.  Id. at 200.  Here, it is undisputed, that Young had already exited the stolen car and fled on foot when he was shot.  The record reflects that Young certainly did not pose the same kind of threat to Fitzgerald or the community as the plaintiff in Brosseau did, nor did Fitzgerald have the same concerns as the police officer there.

Because the Court finds that Young's rights could have been violated, the next step is a determination of whether Young's rights were clearly established when the incident occurred.  The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted. Saucier, 533 U.S. at 202.[15]  In Robinson v. Bibb, 840 F. 2d 349, 351 (6th Cir. 1988), the Sixth Circuit held that in order for a right to be clearly established, a question must be decided

---

[15]  Citing, Wilson v. Layne, 526 U.S. 603, 615 (1999).

12

either by the highest state court in the state where the case arose, by a United States

Court of Appeals, or by the Supreme Court.  (Internal cites omitted).  In finding that an

officer who had shot an unarmed fleeing suspect should not be granted qualified

immunity, the appellate court pointed to the Supreme Court's holding in Tennessee v.

Garner as well as to a substantively similar rule previously set forth by the this circuit

when it decided Garner's case in 1983.  Garner v. Memphis Police Dept., 710 F.2d 240

(6th Cir. 1983). Both the Supreme Court and the Sixth Circuit have found that there is

there is a clear rule as to when deadly force may be used in apprehending a fleeing

suspect.  Therefore, Fitzgerald is not entitled to qualified immunity.

## c. Whether a Genuine Issue of Fact Exists as to Young's Excessive Force Claim

The Court's next step is to determine whether there is a genuine issue of fact to

carry this case past the motion for summary judgment.  The parties are in disagreement

as to many facts, including the crucial question of whether Fitzgerald's actions were

intentional or accidental.[16]

To resolve the disputed versions of the events, the Court would be required to

determine which of the parties is more credible.  Such an exercise is prohibited at the

summary judgment stage, as only the trier of fact may determine credibility, weigh

evidence, and draw inferences.  See Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 255

(1986); see also, Kampouris v. St. Louis Symphony Soc'y, 210 F.3d 845, 847 (8th Cir.

2000) (Bennett, J., dissenting) ("[W]e must not lose sight of the proper function of the

---

[16]  There are also disputes as to the circumstances of the night in question
including whether, Young was the driver or a passenger, and whether the officers were
in the area to investigate a possible shooting.

courts, both appellate and trial, when presented with a motion for summary judgment ...
[W]e perform only a gatekeeper function of determining whether there is evidence in the
summary judgment record generating a genuine issue of material fact for trial on each
essential element of a claim.").  Based on the record, the Court cannot say that  no
genuine issue of material fact exists with respect to Young's excessive force claim.
Indeed, the Sixth Circuit has counseled against granting summary judgment under
circumstances like those presented here.  See Adams v. Metiva, 31 F.3d 375 (6th Cir.
1994) (reversing district court's grant of summary judgment in a 42 U.S.C. §1983 case
when the parties offered differing versions of the events giving rise to, inter alia,
plaintiff's excessive force claim).  Fitzgerald's motion for summary judgment on this
issue must be denied.[17]

## 2. Gross Negligence

Second, Young brings a claim of gross negligence against Fitzgerald under
Michigan law.  Michigan's "gross negligence" exception provides that an "employee" of a
governmental agency is liable for his "gross negligence that is the proximate cause of
the injury or damage."  MCL § 691.1407(2).   "Gross negligence" is defined as "conduct
so reckless as to demonstrate a substantial lack of concern for whether an injury

---

[17]  Fitzgerald argues that there is no genuine issue of fact because Young's
situation is factually similar to the situation in Pleasant v. Zamieski, 895 F.2d 272 (6th
Cir. 1990), where the Sixth Circuit upheld a jury verdict finding that a police officer who
shot the unarmed plaintiff as he was climbing a fence while being pursued for the
attempted theft of a car, did not act unreasonably.  Zamieski is not helpful to Fitzgerald
because even though the parties agreed that the shooting was an accident, the district
court still sent the case to the jury on the issue of reasonableness.  Zamieski makes
clear that the issue of reasonableness appropriately belongs to the jury.

results." "A finding of gross negligence is a question of fact." Manetta v. Kaiser, 955 F. Supp. 771, 781 (E.D. Mich. 1997)(additional cites omitted). Likewise, proximate cause is also a factual issue. Chesapeake & O.Ry. Co. v. Barnaby, 414 F.2d 309, 310 (6th Cir. 1969). Young argues that there is a there is a question of fact as to whether Fitzgerald intentionally or accidentally shot Young as he was fleeing, as well as to the circumstances surrounding the shooting. The forensic report appears to contradicts Fitzgerald's version of the facts. Young says that a jury could hear the evidence and easily conclude that Fitzgerald was the immediate and direct cause of Young's injuries.

Fitzgerald argues in a conclusory fashion that the allegations do not fall within the gross negligence exception and that he consequently enjoys immunity from this claim.

The Court agrees that there is a genuine issue of fact regarding whether Fitzgerald's actions were intentional or accidental. However, all of Young's claims are premised on the argument that Fitzgerald's actions were intentional, and therefore constituting excessive force. Michigan courts do not allow a plaintiff to maintain a negligence claim for intentional actions, and routinely reject such "attempts to transform claims involving elements of intentional torts into claims of gross negligence." Kirby v. Duva, Slip Copy 2006 WL 1722205 (E.D.Mich) (citing, VanVorous v. Burmeister, 687 N.W.2d 132, 143 (Mich.Ct.App.2004); Smith v. Stolberg, 586 N.W.2d 103 (Mich.Ct.App.1998); Sudul v. Hamtramck, 562 N.W.2d 478 (Mich.Ct.App.1997)). Young may not simultaneously assert that Fitzgerald's actions were intentional for purposes of his federal claims, his intentional infliction of emotional distress claim, and his assault and battery claim, but then also claim that Fitzgerald acted with gross negligence. Accordingly, the Court will grant Fitzgerald summary judgment on this

15

issue.[18]

### 3.  Assault and Battery

Third, Young brings a claim of assault and battery against Fitzgerald under Michigan Law.  Michigan recognizes that police officers who use excessive force may be liable for assault and battery.  Sudul v. Hamtamck, 221 Mich. App. 455, 458 (1997).[19] Regarding assault and battery, "an assault is defined as any intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, couples with the apparent present ability to accomplish the contact." VanVorous v. Burmeister, 262 Mich. App. 467, 482-483 (2004).   A battery is defines as "the wilful and harmful or offensive touching of another person which results from an act intended to cause such contact."  Id.

In this case there is a genuine issue of material fact as to whether Fitzgerald intentionally fired upon Young.  Accordingly, the Court will deny Fitzgerald summary judgment on this issue.

### 4.  Intentional Infliction of Emotional Distress

Fourth, Young brings a claim of intentional infliction of emotional distress against Fitzgerald under Michigan Law. Although the Michigan Supreme Court has not officially recognized the tort of intentional infliction of emotional distress, see Smith v. Calvary

---

[18]  Young has not argued in the alternative that if Fitzgerald shot him accidentally, he should still be liable.

[19]  Government employees are not immune from liability for intentional torts, including assault and battery.  Sudul, 221 Mich. App. at 458.

Christian Church, 614 N.W.2d 590 (Mich.2000); Roberts v. Auto-Owners Ins. Co., 374 N.W.2d 905 (Mich.1985), the Michigan Court of Appeals has repeatedly recognized a cause of action based on intentional infliction of emotional distress, and the Sixth Circuit has "assumed that the Michigan Supreme Court would do so too under appropriate circumstances." Andrews v. Prudential Sec., Inc., 160 F.3d 304, 309 (6th Cir.1998). Recovery requires a plaintiff to prove "(1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress." Moore v. City of Detroit, 652 N.W.2d 688, 691 (Mich.Ct.App.2002).

Young argues that Fitzgerald's act of intentionally shooting an unarmed fleeing suspect amounts to conduct so extreme and outrageous as to go beyond all possible bounds of decency, and that any reasonable person would know that emotional distress may result. Fitzgerald maintains that the shooting was accidental, and argues that in light of the circumstances, it was reasonable for him to have pulled out his gun.

It is initially for the Court to decide whether Fitzgerald's conduct might reasonably be regarded as so extreme and outrageous as to allow recovery for intentional infliction of emotional distress. Roberts v. Auto-Owners Ins. Co., 135 Mich.App. 595 (1983). In making the determination, the court should consider the circumstances involved. Rosenberg v. Rosenberg Brothers Special Account, 134 Mich.App. 342, 351 N.W.2d 563 (1984). Fitzgerald's actions did not amount to the intentional infliction of emotional distress, especially considering that he was pursuing what appeared to be a fleeing felon, at night. Such conduct, even when viewing the facts in a light most favorable to Young, is not outrageous. The Court will grant Fitzgerald summary judgment on this issue.

17

## B.  Young's Claims against the City of Detroit

### 1.   Whether the City of Detroit is Liable for Unconstitutionally Deficient Policies and Failure to Properly Train Police Officers

### a.  The Legal Standard for Municipal Liability

A municipality is liable under §1983 if its official policies or informal customs cause constitutional violations. Heflin v. Stewart County, Tennessee, 958 F.2d 709, 716 (6th Cir.1992).  A municipality may have liability for the same actions for which public officials enjoy qualified immunity. Barber v. City of Salem, Ohio, 953 F.2d 232, 237-38 (6th Cir.1992).

To prevail under §1983, a plaintiff must show that the municipality, through a policy or custom, caused the alleged constitutional violation. Monell v. Dept. of Social Services, 436 U.S. 658 (1978). A municipality cannot be vicariously liable under § 1983 for a constitutional violation caused by its employees or agents. Id. at 694.  Rather, a municipality can be liable under §1983 when a government's custom is "so permanent and well settled as to constitute a custom or usage with the force of law," Davenport v. Simmons, 192 F.Supp.2d 812, 824 (W.D.Tenn.2001), or when the government's official policy is the "moving force of the constitutional violation." Monell at 694.  See also Pembaur v. City of Cincinnati, 475 U.S. 469 ("municipal liability under § 1983 attaches where--and only where--a deliberate choice to follow a course of action is made from among various alternatives....").

In order to survive a motion for summary judgment on a §1983 claim, the plaintiff must adduce specific facts to support the claim; the plaintiff may not merely state conclusory allegations. Culberson v. Doan, 125 F.Supp.2d 252, 263-64 (S.D.Ohio

18

2000).

**b.  Whether a Genuine Issue of Fact Exists as to the City of Detroit's Liability**

Young argues that the City of Detroit has not adequately trained its police officers on when they are allowed to use deadly force.  In City of Canton, Ohio v. Harris, 489 U.S. 378 (1989), the Supreme Court held that a municipality may be liable under §1983 for its failure to train its employees.  In order to impose liability against a municipality for failure to train, a plaintiff must establish that (1) the training program was inadequate for the tasks that officers must perform; (2) the inadequacy was the result of the city's deliberate indifference;  and (3) the inadequacy was closely related to or actually caused the injury.  Russo v. City of Cincinnati, 953 F.2d. 1036, 1046 (6th Cir. 1992) (additional citations omitted).

Young argues that the record establishes a genuine issue of material fact as to the City of Detroit's policies and training program for police officers regarding the use of deadly force.  In particular, Young alleges in his complaint that the City of Detroit has failed to train its police officers with regards to (1) when to announce the presence of a police officer; (2) when to unholster a weapon;  (3) when to point a weapon at a citizen; (4) when to turn off the safety on a weapon;  (5) when to place a finger on the trigger of a weapon;  (7) how to de-escalate confrontations; and (8) how to seek distance and barriers before resorting to deadly force.  Moreover, Young says that the City of Detroit is liable for (8) creating and implementing procedures that allow for and promote the use of deadly force in unwarranted and unjustified circumstances.

To support his claim, Young relies on the deposition testimony of  Lashbrook, who was Fitzgerald's partner on the night in question.  Lashbrook was questioned about

19

the City of Detroit's policies and training with regard to when officers should pull out

their weapons while pursuing a suspect.  Lashbrook stated that he was taught what to

do but wasn't sure if he had seen a policy in writing.  When asked whether there is a

policy about pursuing an unarmed individual he stated that he was

"[n]ot sure about a policy about that.  When I pursue somebody, I'm using common

sense for myself.  It depends on the situation what I would do. I don't know the answer

on the policy."

Young argues that Lashbrook is completely unaware of the City of Detroit's

policy on the use of deadly force.  Therefore, a jury could conclude the that the City's of

Detroit's training policy is wholly inadequate and the result of its deliberate indifference.

Young also requests that the Court take judicial notice of the numerous problems the

City of Detroit has faced with the use of deadly force by police officers, which lead to a

federal investigation and the issuance of a consent decree.

The City of Detroit replies that Young has failed to identify the wrongful policy or

custom underlying the alleged constitutional violation, and has not provided legal or

factual support to withstand the motion for summary judgment

Young has not brought forth sufficient evidence to raise a genuine issue of fact

as to the adequacy of the City of Detroit's training program or policies regarding the use

of deadly force.   Young relies primarily on Lashbrook's deposition testimony.  However,

evidence that a single officer does not know the City of Detroit's  policy regarding the

use deadly force is not enough to raise a general question as the City of Detroit's

liability:

> In resolving the issue of a municipalities liability, the focus must be on adequacy
> of the training program in relation to the tasks the particular officers must

20

perform.  That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may  have resulted from factors other than a faulty training program.

City of Canton, Ohio v. Harris,  489 U.S. 378 (1989)(additional citations omitted).

The only other evidence that Young points to are the "problems" the City of Detroit has faced with the use of deadly force by police officers.  Young however, does not explain these "problems" and how they reflect a custom or policy adopted by the City of Detroit.  Thus, Young's conclusory statements do not raise a genuine issue of fact as to the City of Detroit's liability.

## 2. Young's State Law Claims against the City of Detroit

Young also alleges that the City of Detroit is liable for his state-law claims of (1) gross negligence; (2) assault and battery; and (3) intentional infliction of emotional distress.  The City of Detroit argues that it entitled to governmental immunity against Young's state law claims.

Governmental agencies are generally immune from tort liability where they are engaged in the exercise or discharge of a governmental function.  M.C.L. § 691.1407.  The City of Detroit is a municipality, and its operation of the Detroit City Police Department is a governmental function.  Ross v. Consumers Power Co., 420 Mich. 567, 625 (1984).  Moreover, even if Young were to show that Fitzgerald's actions were intentional, the City of Detroit cannot be held vicariously liable for the intentional torts of its employees.  Payton v. City of Detroit, 211 Mich. App. 375, 393 (1995); Alexander v. Riccinto, 192 Mich. App. 65, 71-72 (1991).  Accordingly, City of Detroit's motion for summary judgment must be granted as to Young's state-law claims.

21

## V. Conclusion

For the reasons stated above, the City of Detroit's motion for summary judgment is GRANTED.  Fitzgerald's motion for summary judgment is GRANTED as to Young's claims of (1) gross negligence, and (2) intentional infliction of emotional distress; it is DENIED as to Young's claims of (1) excessive force and (2) assault and battery.

SO ORDERED.

 s/Avern Cohn_____
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated:  October 19, 2006

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, October 19, 2006, by electronic and/or ordinary mail.

 s/Julie Owens_____
Case Manager, (313) 234-5160

22